No. 24-4306

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

CHRISTOPHER CLARK ARTHUR,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of North Carolina
(Hon. James C. Dever, III, No. 7:22-cr-5)

———————————

BRIEF FOR THE UNITED STATES

———————————

DANIEL P. BUBAR
Acting U.S. Attorney for the
Eastern District of North Carolina

DAVID A. BRAGDON
Assistant U.S. Attorney

SUE J. BAI
Supervisory Official for the
National Security Division

JOSEPH P. MINTA
GAVAN W. DUFFY GIDEON
Attorneys, Appellate Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel.: 202-353-9055
joseph.minta@usdoj.gov

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

ISSUES PRESENTED ......................................................................... 3

RELEVANT STATUTORY PROVISIONS ........................................... 3

STATEMENT ..................................................................................... 4

     A.    Arthur's Proffered Training .................................................. 4

     B.    Arthur's Arrest .................................................................... 9

     C.    District Court Proceedings .................................................. 9

SUMMARY OF ARGUMENT ............................................................ 14

ARGUMENT ..................................................................................... 17

   I.     Section 842(p)(2)(B) Is Not Unconstitutionally Overbroad. ...... 17

     A.    The Statute Does Not Burden a Substantial Amount of
          Protected Speech. ............................................................. 19

       1.   Congress carefully crafted Section 842(p)(2)(B) .................. 19

       2.   Arthur has not identified any protected speech that
           Section 842(p)(2)(B) would prohibit .................................. 22

     B.    The Statute Legitimately Restricts Speech Integral to
          Criminal Conduct. ............................................................ 26

   II.    There Was No Error at Arthur's Sentencing. ........................... 33

     A.    The District Court Properly Applied U.S.S.G. § 3A1.4 in
          Calculating Arthur's Guidelines Range. ............................. 34

       1.   Arthur's crime involved a violation of Section 1114 ............ 35

       2.   Arthur's crime was intended to promote a violation of
           Section 1114 ...................................................................... 36

     B.    Any Error in Applying U.S.S.G. § 3A1.4 Was Harmless. ......... 39

CONCLUSION .................................................................................. 43

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                   <u>Page(s)</u>

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) (per curiam) ........................................... 10, 18, 30

*Counterman v. Colorado,*
   600 U.S. 66 (2023) .................................................................. 30

*Hamling v. United States,*
   418 U.S. 87 (1974) .................................................................. 30

*Marquez-Reyes v. Garland,*
   36 F.4th 1195 (9th Cir. 2022) ................................................. 22

*Members of City Council of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ................................................................. 25

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran,*
   411 F.2d 934 (7th Cir. 1969) ................................................... 29

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................................................. 30

*Rice v. Paladin Enterprises,*
   128 F.3d 233 (4th Cir. 1997) ........................................ 27, 31, 32

*United States v. Ackell,*
   907 F.3d 67 (1st Cir. 2018) ..................................................... 27

*United States v. Awan,*
   607 F.3d 306 (2d Cir. 2010) .................................................... 37

*United States v. Barringer,*
   25 F.4th 239 (4th Cir. 2022) ................................................... 33

*United States v. Bolden,*
   325 F.3d 471 (4th Cir. 2003) .................................................... 4

*United States v. Castellanos-Loya,*
   503 F. App'x 240 (4th Cir. 2013) (unpublished) .................... 24

*United States v. Chandia,*
   514 F.3d 365 (4th Cir. 2008) ................................................... 34

**Cases (cont'd)** Page(s)

*United States v. Chappell,*
   691 F.3d 388 (4th Cir. 2012)......................................................25, 26

*United States v. Coronado,*
   461 F. Supp. 2d 1209 (S.D. Cal. 2006) ..................................23

*United States v. Edler Industries,*
   579 F.2d 516 (9th Cir. 1978)..................................................29

*United States v. Featherston,*
   461 F.2d 1119 (5th Cir. 1972)................................................28

*United States v. Gomez-Jimenez,*
   750 F.3d 370 (4th Cir. 2014)..................................................40

*United States v. Graham,*
   275 F.3d 490 (6th Cir. 2001)..................................................38

*United States v. Hansen,*
   599 U.S. 762 (2023)....................................................... *passim*

*United States v. Hardy,*
   999 F.3d 250 (4th Cir. 2021)..................................................33

*United States v. Hasson,*
   26 F.4th 610 (4th Cir. 2022) ............................................37, 39

*United States v. Kobito,*
   994 F.3d 696 (4th Cir. 2021).........................................35, 36, 37, 38

*United States v. Mayes,*
   No. 18-CR-154, 2022 WL 203373 (E.D. Wis. Jan. 24, 2022)...............29

*United States v. McLaughlin,*
   No. 23-4493, 2024 WL 3690770 (4th Cir. Aug, 7, 2024) ......................41

*United States v. Mills,*
   917 F.3d 324 (4th Cir. 2019)..................................... 16, 40, 42

*United States v. Miselis,*
   972 F.3d 518 (4th Cir. 2020)................................... 15, 18, 26, 30

*United States v. Pascoe,*
   No. 22-cr-88, 2025 WL 492007 (W.D. Ky. Feb. 13, 2025) ...................29

**Cases (cont'd)** Page(s)

*United States v. Rivera-Santana,*
668 F.3d 95 (4th Cir. 2012)..................................................41

*United States v. Stevens,*
559 U.S. 460 (2010)...............................................15, 27, 33

*United States v. Williams,*
553 U.S. 285 (2008)......................................................19, 26

*Virginia v. Hicks,*
539 U.S. 113 (2003)................................................15, 18, 22

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442...........................................................................22

**Statutes**

18 U.S.C. § 1114 ...............................................21, 34, 35

18 U.S.C. § 2101(a) ......................................................31

18 U.S.C. § 231(a)(1)..............................................28, 29

18 U.S.C. § 2332b(g)(5)........................................12, 34, 36

18 U.S.C. § 3231 ............................................................3

18 U.S.C. § 3553(a) .....................................................13

18 U.S.C. § 3742 ............................................................3

18 U.S.C. § 842(p)(2)(A)...............................................23

18 U.S.C. § 842(p)(2)(B)........................................*passim*

18 U.S.C. § 844(a)(2).....................................................19

18 U.S.C. § 844(o) .........................................................21

18 U.S.C. § 922(k)..........................................................10

18 U.S.C. § 924(c) .........................................................14

22 U.S.C. § 2778 ............................................................29

26 U.S.C. § 5861(d) .......................................................10

28 U.S.C. § 1291 .............................................................3

Pub. L. No. 94-329, § 212, 90 Stat. 729, 744 (June 30, 1976)................29

iv

**Other Authorities**                                                    <u>Page(s)</u>

Model Penal Code § 2.02(7) .................................................................24

U.S. Dep't of Justice, *Report on the Availability of Bombmaking
Information, the Extent to Which its Dissemination Is Controlled by
Federal Law, and the Extent to Which Such Dissemination May Be
Subject to Regulation Consistent with the First Amendment to the
United States Constitution* (Apr. 1997),
https://books.google.com/books?id=falHAQAAIAAJ .....................20, 21

U.S. Sentencing Guidelines § 3A1.4 ...............................................11, 34

U.S. Sentencing Guidelines § 5G1.2(d)................................................12

## **INTRODUCTION**

Through his company Tackleberry Solutions, Christopher Clark Arthur offered training in weapons, military tactics, and explosives—methods he acknowledged "may be highly illegal." J.A.325. He trained Joshua Blessed before Blessed died in a shootout with police, including by providing him a manual titled "Quick Reaction Force, Modern Day Minutemen, Improvised Explosives." J.A.324. Arthur also trained "Buckshot," an FBI confidential informant, in explosives and tactics, after Buckshot expressed concern about federal agents returning to his home. J.A.33-121. Arthur taught Buckshot how to turn one's property into "a freaking death box" by strategically placing improvised explosive devices and other traps throughout the premises. J.A.42. A later search of Arthur's property revealed several such improvised explosive devices as well as other illegal firearms. J.A.292-295, J.A.373.

On appeal, Arthur does not contest the government's proof that he committed any of the charged offenses. *See* Br. 7. Instead, he argues that the statute underlying Count 1, 18 U.S.C. § 842(p)(2)(B), is unconstitutionally overbroad. The statute, however, prohibits providing bombmaking instruction only in the narrow circumstances where one

knows that the recipient intends to use the information in a federal crime of violence. Arthur fails to identify *any* First Amendment protected activity that this statute would criminalize, "let alone enough to justify throwing out the law's plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 766 (2023) (quotation marks omitted). Moreover, Arthur fundamentally misunderstands the applicable First Amendment framework that would apply in attempting to identify such protected activity. Accordingly, this Court should affirm the district court's decision rejecting Arthur's facial challenge to this carefully tailored criminal statute.

Arthur's appeal of his sentence fares no better. The district court did not err in applying the terrorism enhancement in U.S. Sentencing Guidelines § 3A1.4, as the court carefully made the required findings based on the parties' submissions and the evidence at trial. In any event, even if the district court did err, any error would have been harmless, because the court made clear it would have imposed the same sentence of 300 months' imprisonment without the enhancement. J.A.799-800. This Court should affirm Arthur's conviction and sentence.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The court entered its judgment on June 6, 2024, J.A.13, and Arthur filed a timely notice of appeal, J.A.811. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court correctly found that 18 U.S.C. § 842(p)(2)(B) is not facially unconstitutional.

2. Whether the district court committed prejudicial error in applying U.S. Sentencing Guidelines § 3A1.4 in calculating Arthur's advisory guidelines range.

## RELEVANT STATUTORY PROVISIONS

Section 842(p)(2) of Title 18, U.S. Code, states:

It shall be unlawful for any person—

(A) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence; or

3

(B) to teach or demonstrate to any person the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute to any person, by any means, information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, knowing that such person intends to use the teaching, demonstration, or information for, or in furtherance of, an activity that constitutes a Federal crime of violence.

## STATEMENT

On appeal, Arthur does not dispute his factual guilt and claims "the facts of his offense conduct are not relevant to the issues on appeal." *See* Br. 7. But the details of his criminal conduct show both that his violation of Section 842(p)(2)(B) falls outside the First Amendment's protections and that his sentence was reasonable. The narrative below recounts "the facts in the light most favorable to the Government [and] to the district court's [sentencing] determinations." *United States v. Bolden*, 325 F.3d 471, 479 n.5 (4th Cir. 2003).

### A. Arthur's Proffered Training

Christopher Arthur founded Tackleberry Solutions in October 2017. J.A.545. Arthur originally planned for the company to sell military gear, J.A.543, but he later shifted the company's mission to "training," with a goal of "help[ing] the average person to be able to

4

defend themselves" against "a tyrannical government of our own or an invading tyrannical government." J.A.546-547. He published videos and sold manuals online with titles including "Fatal Funnels, Wartime Tactics, Repelling the Assault," J.A.385, and "Quick Reaction Force, Modern Day Minutemen, Improvised Explosives," J.A.324-325. The latter publication included the warning: "These are wartime tactics, not peacetime tactics. Some of these methods may be highly illegal." J.A.325.

One of Arthur's customers was Joshua Blessed. Arthur provided Blessed with six manuals that Arthur had authored, J.A.323, and trained Blessed in person over the course of a week in March 2020, J.A.135. In email communications, the two also discussed the merits of different styles of anti-personnel mines. J.A.741. In June 2020, New York law enforcement officers attempted a traffic stop of Blessed. J.A.135. He led police on a two-hour chase and was killed in an exchange of gunfire with the officers. J.A.135. A later search of Blessed's home found fourteen live pipe bombs that were identical to those described in Arthur's manuals. J.A.135, J.A.741.

Another of Arthur's customers was "Buckshot," an FBI confidential informant. In March 2021, Buckshot viewed the Tackleberry Solutions video "How to Repel a Trained Militarist Force" and requested a free PDF from Arthur through a link in that video. J.A.741. Arthur provided the document while noting, "I've had to keep parts of this information off the internet. Especially since explosives are such a touchy topic. There is no digital copy of some of the things I want to share with you." J.A.741. Buckshot then purchased two additional manuals from Arthur. Arthur also provided Buckshot a thumb drive that included nineteen videos with titles such as "Repel the Assault," "DAF Tactically Acquiring a Vehicle," and "Explosives." J.A.343.

Buckshot accepted Arthur's offer of in-person training, and in May 2021, he traveled to Arthur's home. Upon arriving, Buckshot explained to Arthur, "ATF's been to my house. . . . [T]hey're probably coming back. . . . [W]hen they do, I want to be ready." J.A.38. Arthur told Buckshot he could "guaren-damn-tee" the agents would return and that Buckshot had two choices: "Stand and fight or be, ah, not exactly where you're supposed to be." J.A.38. Buckshot told Arthur that moving was not an option. J.A.41. Arthur then spent nearly three hours instructing

6

Buckshot on how to fortify his residence against the return of such federal agents.

After reviewing a picture of Buckshot's property, Arthur first recommended creating an electrified fence around the property and training attack dogs. J.A.61. Arthur suggested that with the fence and other modifications to the property, Buckshot could create a "fatal funnel" that would delay law enforcement from approaching his house "[a]nd that's when you start lobbing your grenades on them with your freaking shotty [shotgun]." J.A.63. He also suggested mounting cans of Tannerite[1] around the property that could be detonated with a rifle shot. J.A.71. In addition to this "perimeter defense," Arthur suggested that "putting some [improvised explosive devices (IEDs)] right up around the doors [of the house] wouldn't be a bad idea." J.A.56, J.A.71. Arthur noted that he kept such an IED on his own front porch. J.A.71.

For inside the residence, Arthur suggested "a setup called the Spiderweb," which he said "is a freaking death box." J.A.42. Arthur noted he had created one for a friend and recommended a similar setup

---

[1] Tannerite is a commercially available explosive, commonly used to make exploding targets for marksmanship purposes. *See* J.A.304.

for Buckshot's house. J.A.61. The "Spiderweb" involved blocking most entrances to the house and then placing remotely operated explosives near the remaining entrances, along with a "sentry gun" that could be remotely fired. J.A.78-80. Combined with a "punji trap" (a false floor that collapses) in the front hallway, their goal was that "[e]verybody just piles right up right there [and] [t]hat's when he [the friend] starts flipping the switches . . . Pack-boom! Pack-boom! Pack-boom! Pack-boom! [A]nd he just blew this whole freaking hallway completely over." J.A.83-84. Arthur offered to Buckshot, "I can help you design it. I can help you build it." J.A.84.

Arthur then showed Buckshot how to use a lightbulb to make a detonator, to "[g]ive [him] something to start with." J.A.91-92. This device would allow Buckshot to wire a switch to an explosive, as Arthur had done with the pipe bomb on his front porch. J.A.93. They also discussed modifying a shotgun into a "thumper" that could fire homemade grenades from a distance. *See* J.A.94-95. Buckshot paid Arthur for the training, and the two agreed to keep in touch. J.A.119.

### B.    Arthur's Arrest

Arthur was arrested in January 2022 at a gun show where he had arranged to meet Buckshot again. J.A.366. At the same time, the FBI executed a search warrant at Arthur's residence. As the FBI approached the home, agents found a pipe bomb in a bucket on the front porch. J.A.291. The bomb was connected to a switch on a bookshelf in a narrow hallway. J.A.295. In Arthur's bedroom, the FBI found a tactical vest with another IED in one of its pockets as well as a backpack containing two additional IEDs. J.A.299. The FBI also found numerous firearms in the residence, including a Palmetto State Armory rifle. J.A.373. The rifle's barrel had been shortened, and a silencer with an obliterated serial number was attached. J.A.373, J.A.421-422. Outside the home, the FBI found a strategically placed can of Tannerite like the one that Arthur had described to Buckshot. J.A.305.

### C. District Court Proceedings

Based on the training Arthur provided to Buckshot, a grand jury charged Arthur with violating 18 U.S.C § 842(p)(2)(B), which prohibits teaching or demonstrating the making or use of explosives when a defendant knows the recipient intends to use that information in a

9

federal crime of violence (Count 1). *See* J.A.15. The explosives and

illegal firearms found during the search of Arthur's residence formed

the bases of Counts 2 through 9, which alleged violations of 26 U.S.C.

§ 5861(d) (prohibiting possession of unregistered firearms) and 18

U.S.C. § 922(k) (prohibiting receipt of firearms with obliterated serial

numbers). *See* J.A.15-18.

The district court denied Arthur's pretrial motion to dismiss Count

1, rejecting his claim that Section 842(p)(2)(B) was facially overbroad in

violation of the First Amendment. *See* J.A.134.[2] The district court held

that "the statute is not overbroad and does not restrict protected

speech." J.A.142. The court explained that Arthur's reliance on

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), was misguided

because "the Fourth Circuit limits *Brandenburg*'s protection to mere or

'abstract' advocacy," while "Section 842(p)(2)(B) and its knowledge

requirement ensure the prohibited conduct goes well beyond abstract

advocacy." J.A.142-143 (cleaned up). The court also rejected Arthur's

---

[2] Arthur also brought an as-applied First Amendment challenge to Count 1 and a Second Amendment challenge to Counts 2 through 9. He does not renew those challenges on appeal.

10

overly expansive reading of the statute, noting that "[s]imply discussing the right to lawfully possess and use a firearm does not fit the requirement[s]" of the statute. J.A.143.

Arthur's three-day jury trial took place in July 2023. The government's witnesses at trial were five FBI special agents, an FBI chemist, an FBI explosives expert, and an ATF agent. These witnesses testified primarily about the search of Arthur's residence and the items found there. The jury also heard a recording of Buckshot's meeting with Arthur. *See* J.A.512. Arthur testified in his own defense, admitting that he possessed all the items charged in Counts 2 through 9, J.A.573-578, and that he had produced Tackleberry Solutions' training materials, J.A.581. After deliberating for approximately two hours, the jury found Arthur guilty on all counts. J.A.689-693.

At sentencing, the parties primarily disputed whether Arthur's conduct "involved, or was intended to promote, a federal crime of terrorism," thereby triggering the enhancement set forth in U.S. Sentencing Guidelines § 3A1.4. The district court held that the enhancement applied because Arthur's conduct "involve[d] distributing information knowing that it would be used to murder [or] attempt to

11

murder an officer or employee of the United States in violation of 18

U.S.C. § 1114." J.A.775; *see also* U.S.S.G. § 3A1.4 cmt. n.1 (importing

the definition of "federal crime of terrorism" from 18 U.S.C.

§ 2332b(g)(5), which includes Section 1114). Alternatively, the court

concluded the enhancement applied because Arthur's conduct was

intended to promote a violation of Section 1114. *See* J.A.775-776 ("The

defendant was encouraging and contributing to the murder or

attempted murder of the federal law enforcement officers."). In addition,

the court found that one of Arthur's purposes "was to [a]ffect the

conduct of Government by coercion and to retaliate against Government

conduct." J.A.776.

　　After rejecting Arthur's other objections to the Presentence

Investigation Report, the district court determined that Arthur's offense

level was 43 and his criminal history category was VI, resulting in an

advisory guidelines sentence of life imprisonment. J.A.783. Pursuant to

U.S. Sentencing Guidelines § 5G1.2(d), this guidelines sentence was

reduced to 1,140 months' imprisonment, the total statutory maximum

for Arthur's offenses—240 months' imprisonment on Count 1, 120

12

months' imprisonment on each of Counts 2 through 8, and 60 months'
imprisonment on Count 9. J.A.783; *see also* J.A.827.

The district court then weighed the sentencing factors under
18 U.S.C. § 3553(a). The court described Arthur's offenses as "very
serious criminal activity," and it found that Arthur had "basically
admitted to the crimes when [he] testified." J.A.793-796. At the same
time, the court credited the mitigation evidence in the record, citing
Arthur's family support, military history, and lack of criminal history.
J.A.796-797. Based on that evidence, the court determined that some
downward variance from the guidelines sentence was warranted.
J.A.797. But the court also emphasized that Arthur had admitted to the
criminal activity without "expressing remorse." J.A.797. And it
concluded that "teaching someone to kill an ATF agent is seriously
wrong and worthy of just punishment," noting the impact that concerns
about violence against law enforcement officers can have on their
families. J.A.797.

Balancing those factors, the court sentenced Arthur to 240 months'
imprisonment on Count 1, 120 months' imprisonment on each of Counts
2 through 8 (to be served concurrently), and 60 months' imprisonment

13

on Count 9 (to be served consecutively, as 18 U.S.C. § 924(c) requires),

for a total sentence of 300 months' imprisonment, followed by three

years of supervised release. J.A.798. The court stated that it would have

imposed the same sentence even if it had miscalculated the advisory

guideline range, describing the sentence as "sufficient but not greater

than necessary for [Arthur] in light of all the 3553(a) factors." J.A.799-

800.

## **SUMMARY OF ARGUMENT**

This Court should affirm Arthur's conviction and sentence. Arthur

has not shown either that Section 842(p)(2)(B) is facially

unconstitutional or that the district court erred in calculating his

advisory sentencing guidelines range.

Section 842(p)(2)(B) does not "prohibit[] a substantial amount of

protected speech relative to its plainly legitimate sweep." *United States

v. Hansen*, 599 U.S. 762, 770 (2023) (quotation marks omitted).

Initially, Arthur has not shown that the statute prohibits *any* amount of

protected speech, as each of his proffered hypotheticals (*see* Br. 16-17)

ignores or misunderstands the statute's requirement that a defendant

have knowledge that the recipient of his instruction intends to use the

explosives training in a federal crime of violence. "The overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up). Arthur has failed to shoulder that burden, and this Court should affirm on that basis alone.

Separately, Arthur errs in identifying the "plainly legitimate sweep" of Section 842(p)(2)(B). The First Amendment permits "restrictions upon the content of speech in a few limited areas," including "speech integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up). Section 842(p)(2)(B) requires an explicit nexus to a federal crime of violence and is therefore such a permissible restriction. Arthur is wrong in suggesting that a statute such as this can survive only if it addresses speech constituting incitement. *See* Br. 14. Rather, this Court has recognized that speech integral to criminal conduct is "a second category of unprotected speech . . . which may be proscribed without regard to whether it's directed and likely to produce imminent lawlessness." *United States v. Miselis*, 972 F.3d 518, 533 (4th Cir. 2020). Section 842(p)(2)(B), with its limited focus on bombmaking information and its requirement of a close nexus to

15

criminal conduct, restricts that latter type of speech—which also falls

outside the First Amendment's protections. Given the large "plainly

legitimate sweep" of the statute—a sweep that Arthur does not contest

includes his own conduct—this Court should reject his claim that

Section 842(p)(2)(B) is facially overbroad.

Arthur's challenge to his sentence similarly fails. The district

court did not err in finding either that Arthur's offense "involved" a

federal crime of terrorism or that it "was intended to promote" such a

crime. Arthur's offense "involved" such a crime, as Section 842(p)(2)(B)

required that he know that Buckshot intended to use Arthur's training

in furtherance of a federal crime of violence. And Arthur's claim that

the district court failed to find his offense was "intended to promote"

such a crime ignores the court's finding that Arthur's offense

"encourag[ed] and contribut[ed] to" the murder or attempted murder of

federal law enforcement officers. J.A.776. Either basis is sufficient for

this Court to affirm Arthur's sentence.

Even if the district court erred in both respects, any such error

would have been harmless. *See United States v. Mills*, 917 F.3d 324, 330

(4th Cir. 2019). The district court made clear that it would have

16

imposed the same sentence even if it had miscalculated Arthur's advisory guidelines range, and Arthur does not claim that his sentence was substantively unreasonable. As the district court held, "teaching someone to kill an ATF agent is seriously wrong and worthy of just punishment." J.A.797. This Court should affirm Arthur's sentence for his crimes.

## ARGUMENT

## I.    SECTION 842(p)(2)(B) IS NOT UNCONSTITUTIONALLY OVERBROAD.

"An overbreadth challenge is unusual" because it allows "a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *Hansen*, 599 U.S. at 769. "Because it destroys some good along with the bad, invalidation for overbreadth is strong medicine that is not to be casually employed." *Id.* at 770 (cleaned up). "If the challenger demonstrates that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially

17

invalid." *Id.* This Court reviews a statute's constitutionality de novo. *Miselis*, 972 F.3d at 525.

Arthur's challenge to Section 842(p)(2)(B) fails on both sides of the scale. First, he fails to show the law prohibits *any* protected speech, let alone a substantial amount. Because Arthur "bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists," *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up), this failure alone is sufficient for the Court to reject his claim. Second, Arthur misunderstands the proper framework for identifying the statute's "plainly legitimate sweep." Section 842(p)(2)(B) complies with the First Amendment because it addresses "speech integral to unlawful conduct," *Hansen*, 599 U.S. at 783. Arthur's lengthy discussion of the extent to which the statute complies with *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), is largely irrelevant. Because Arthur has provided no basis for the Court to employ the draconian remedy of facially invalidating 18 U.S.C. § 842(p)(2)(B), the Court should affirm his conviction on Count 1.

## A. The Statute Does Not Burden a Substantial Amount of Protected Speech.

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). While Arthur's brief skips this step, a careful analysis of the statute shows that none of his hypothetical examples falls within Section 842(p)(2)(B)'s ambit.

### 1. Congress carefully crafted Section 842(p)(2)(B)

The plain language of Section 842(p)(2)(B) prohibits teaching bombmaking in the narrow circumstances where a defendant knows that the recipient intends to use the information in furtherance of a federal crime of violence. Violations of the statute are punishable by a term of imprisonment of up to 20 years. *See* 18 U.S.C. § 844(a)(2). As explained below, Congress carefully crafted this provision to address a particular problem without running afoul of the First Amendment.

Before passing the legislation that would become Section 842(p)(2)(B), Congress asked the Department of Justice to submit a report on the extent of the problem of publicly available bombmaking

instructional materials and potential constitutional limitations on Congress's ability to restrict their dissemination. The Department of Justice submitted that report in April 1997. *See* U.S. Dep't of Justice, *Report on the Availability of Bombmaking Information, the Extent to Which its Dissemination Is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution* (Apr. 1997), https://books.google.com/books?id=falHAQAAIAAJ.

With respect to the First Amendment, the report acknowledged that "a 'facilitation through speech' prohibition without an 'intent' requirement would raise serious First Amendment problems." *Id.* at 47. But as Arthur notes (at 5), the report concluded that "these First Amendment concerns can be overcome, and that such a facilitation prohibition could be constitutional, if drafted narrowly." *Id.* at 48. The report described the approach that Congress later enacted as Section 842(p)(2)(B) as the "safest strategy" in drafting such a facilitation prohibition because it is "tailored to particular recipients who are likely to make criminal use of the information." *Id.* at 48-49. "The person conveying the information would be required only to withhold its

20

distribution to particular persons who pose an apparent risk, and otherwise would be able to continue general publication, distribution or sales." *Id.*[3]

The resulting statute, as reflected in the jury instructions[4] here, has two elements: It prohibits (1) "t[eaching] or demonstrat[ing] to any person the making or use of an explosive, a destructive device, or a weapon of mass destruction" (2) "kn[owing] at the time . . . that the person intended to use the . . . information for, or in furtherance of, an activity that constitutes a federal crime of violence." J.A.670. Here, the crime of violence was a violation of 18 U.S.C. § 1114, which prohibits the murder or attempted murder of federal law enforcement officers.

---

[3] The report also considered (at 50) an approach that would have replaced the *mens rea* requirement of knowledge with the "reasonable cause to believe" standard found in statutes such as 18 U.S.C. § 844(o). Congress opted not to adopt this approach, but instead enacted a statute that largely tracked the Department of Justice's proposal, which was designed to avoid "serious constitutional questions" and render the statute "more likely to pass constitutional muster in most or all of its applications." *See id.* at 51-53.

[4] Arthur has not challenged these instructions on appeal. Thus, although Arthur's First Amendment challenge requires the Court to address the statute as drafted, all agree that the jury instructions accurately reflected the statute's elements.

The district court thus emphasized to the jury that, to find Arthur guilty, it was required to find beyond a reasonable doubt that Arthur "knew that the person he was instructing intended to commit an act constituting the murder or attempted murder of federal law enforcement." J.A.671.

2. Arthur has not identified any protected speech that Section 842(p)(2)(B) would prohibit

With this understanding of the statute, this Court can examine whether Arthur has met his "burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists," *Hicks*, 539 U.S. at 122 (cleaned up). He has not, and courts "generally do not apply the strong medicine of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008). This Court should therefore affirm Arthur's conviction on Count 1.[5]

---

[5] In the absence of such examples of overbreadth, this Court does not need to define the statute's outer bounds. *See, e.g.*, *Marquez-Reyes v. Garland*, 36 F.4th 1195, 1207 (9th Cir. 2022) ("We need not decide whether section 1182(a)(6)(E)(i) reaches *only* unprotected speech. It is (continued . . .)

Arthur first suggests that Section 842(p)(2)(B) would prohibit members of the military from teaching about explosives since "military installations can be affected by the gang phenomenon," and some "military members have been prosecuted for being members of violent extremist groups." Br. 16-17 (quotation marks omitted). But Section 842(p)(2)(B) requires particularized knowledge of a specific recipient's intent, and Arthur's hypothetical alleges no such knowledge. Without such knowledge, generalized instruction of the sort Arthur describes would fall outside the provision's scope.[6] By contrast, Arthur knew that Buckshot intended to use the information Arthur provided to attempt to

---

enough to say that, to the extent the statute may reach some protected speech, it is not substantially overbroad relative to its legitimate sweep.").

[6] When dealing with generalized instruction to a large audience, Section 842(p)(2)(A) is the more applicable prohibition, and even Arthur concedes this provision "may very well be constitutional." Br. 14-15; *see also United States v. Coronado*, 461 F. Supp. 2d 1209, 1213 (S.D. Cal. 2006) (rejecting overbreadth challenge because "[t]he specific focus of [Section 842(p)(2)(A)] is not on mere teaching, demonstrating, or disseminating information on how to construct a destructive device, but upon [doing so] with the specific intent that the knowledge be used to commit a federal crime of violence"). Instead of knowledge of a specific individual's intent to use the teaching in furtherance of a crime of violence, subsection (A) requires that the teacher himself intend the teaching "be used" in furtherance of a crime of violence.

murder the ATF agents Arthur said would surely return to Buckshot's property.

Arthur also suggests that Section 842(p)(2)(B) would prohibit physics teachers from teaching "basic physics concepts to a class in which they have any suspicion of any class-members' intentions." Br. 17. This example misunderstands the second element in a different way. "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *United States v. Castellanos-Loya*, 503 F. App'x 240, 242 (4th Cir. 2013) (unpublished) (quoting Model Penal Code § 2.02(7)).[7] A teacher's "suspicion" about a student's possible antipathy toward the government would not satisfy that standard, unlike the certainty with which Buckshot expressed his intentions, *see* J.A.38 ("[T]hey're probably coming back. . . . [W]hen they do, I want to be ready.").

---

[7] Neither Arthur nor the government asked the district court for a jury instruction explaining the level of knowledge required.

Because he fails to provide any examples of the statute prohibiting protected speech, Arthur cannot sustain his facial challenge to Section 842(p)(2)(B). He does not contest that the statute can be constitutionally applied to his own conduct. Br. 7. And even if creative minds could imagine strange hypotheticals where the statute did prohibit protected speech, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Hansen*, 599 U.S. at 770 ("a law's unconstitutional applications must be realistic, not fanciful"); *United States v. Chappell*, 691 F.3d 388, 393 (4th Cir. 2012) ("We decline to facially invalidate [a law prohibiting impersonating an officer] just because Chappell can conceive of far-fetched applications involving innocent behavior."). With neither facts nor hypotheticals showing substantial overbreadth, this Court should reject Arthur's attempt to facially invalidate Section 842(p)(2)(B).

## B. The Statute Legitimately Restricts Speech Integral to Criminal Conduct.

Recognizing that "facial invalidation of legislation is disfavored," *Chappell*, 691 F.3d at 392, courts "have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," before declaring an act of Congress facially unconstitutional, *Williams*, 553 U.S. at 292. As explained above, Arthur's overbreadth challenge fails first and foremost because he has not shown that Section 842(p)(2)(B) prohibits any activity protected by the First Amendment. But Arthur compounds that failure by misidentifying the First Amendment framework relevant to defining the statute's plainly legitimate sweep. *Cf. Miselis*, 972 F.3d at 532 (assessing overbreadth by "delineating the scope of *unprotected* speech that the statute aims to regulate" (emphasis added)). Properly analyzed, Section 842(p)(2)(B) legitimately restricts speech integral to criminal conduct, as this case demonstrates.

"From 1791 to the present . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas," namely

certain "historic and traditional categories," including "speech integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up). This category encompasses a wide array of crimes that are often committed through speech, including conspiracy, solicitation, perjury, and extortion. *Rice v. Paladin Enterprises*, 128 F.3d 233, 244 (4th Cir. 1997) (collecting examples and noting that "[w]ere the First Amendment to bar or to limit government regulation of such speech brigaded with action, the government would be powerless to protect the public from countless of even the most pernicious criminal acts and civil wrongs") (internal citation and quotation marks omitted); *see also United States v. Ackell*, 907 F.3d 67, 75-76 (1st Cir. 2018) (rejecting First Amendment challenge to stalking statute). And this is true even where the statute is more specifically targeted at expressive activity. *See Hansen*, 599 U.S. at 783 (collecting examples including promotion of contraband, solicitation of unlawful employment, and illegal picketing).

Section 842(p)(2)(B) is no different. As this case shows, teaching and instruction regarding explosives can be an integral part of serious federal crimes, including the attempted murder of federal law enforcement officials. Buckshot presented himself to Arthur as needing

27

guidance on how to secure his home against federal agents. In response, Arthur taught Buckshot how to turn his property into "a freaking death box" that would be "absolutely lethal as hell." J.A.42, J.A.84. Such conduct finds no refuge in the First Amendment, and Arthur does not claim otherwise.

Nonetheless, Arthur complains that Section 842(p)(2)(B) requires mere knowledge (rather than intent) that the recipient of explosives training intends to use that information in a federal crime of violence. *See* Br. 14. But an intent requirement is not an irreducible condition of the First Amendment. For example, in *United States v. Featherston*, 461 F.2d 1119 (5th Cir. 1972), the Fifth Circuit rejected an overbreadth challenged to a similar statute, 18 U.S.C. § 231(a)(1), which prohibits providing explosives or firearm instruction "knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder." *Id.* at 1121-22;[8] *see also Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934,

---

[8] Arthur claims that *Featherston* is distinguishable because the jury instructions in that case required a finding of intent. *See* Br. 18-19. Because *Featherston* addressed a facial challenge to the statute, the particular jury instructions were irrelevant to the analysis.

28

937 (7th Cir. 1969) (rejecting overbreadth challenge to Section 231(a)(1) because the *mens rea* language "narrows the scope of the enactment by exempting innocent or inadvertent conduct from its proscription"); *United States v. Mayes*, No. 18-CR-154, 2022 WL 203373, at *9 (E.D. Wis. Jan. 24, 2022) (similar). Likewise, in *United States v. Edler Industries*, 579 F.2d 516 (9th Cir. 1978), the Ninth Circuit rejected a First Amendment challenge to a prohibition in the Mutual Security Act of 1954[9] on exporting technical data and other information "know[ing] or hav[ing] reason to know that [the] information is intended for [a] prohibited use," such as weapons development. *Id.* at 520-22.

Other categories of unprotected speech similarly do not require that a speaker act with a specific, illegal intent. For example, in *Counterman v. Colorado*, the Supreme Court held in the context of true threats that "a mental state of recklessness is sufficient" to impose

---

[9] The specific provision at issue in *Edler Industries* was repealed in 1976 and replaced with the Arms Export Control Act (AECA), 22 U.S.C. § 2778 *et seq*. *See* Pub. L. No. 94-329, § 212, 90 Stat. 729, 744 (June 30, 1976). Courts have also rejected First Amendment overbreadth challenges to the AECA's similar provision. *See, e.g.*, *United States v. Pascoe*, No. 22-cr-88, 2025 WL 492007 (W.D. Ky. Feb. 13, 2025).

criminal liability. 600 U.S. 66, 69 (2023). Likewise, liability for

defamation of a public figure exists where the speaker acts with

"knowledge that [his speech] was false or with reckless disregard of

whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S.

254, 280 (1964). And criminalizing the publication of obscenity is

permissible where the defendant "had knowledge of the contents of the

materials he distributed, and . . . knew the character and nature of the

materials." *Hamling v. United States*, 418 U.S. 87, 123 (1974).

To be sure, Arthur is correct that when it comes to First

Amendment restrictions on "abstract advocacy," the Supreme Court has

set out a rigorous test. *See generally* Br. 13-21 (discussing at length

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam)). But Arthur

was not engaged in abstract advocacy, and he is wrong in concluding

that the test for incitement applies here. Arthur claims:

> A glance at [Section 842(p)(2)(B)] reveals that the category of
> unprotected speech that lies at the core of the statute's prohibition
> is that which also lies at the origin of First Amendment
> jurisprudence: "incitement."

Br. 13 (quoting but altering *Miselis*, 972 F.3d at 532). But that

quotation represents this Court's conclusion regarding the Anti-Riot

Act, 18 U.S.C. § 2101—a statute that targets incitement by making it unlawful to "incite a riot." 18 U.S.C. § 2101(a). By contrast, "the category of unprotected speech that lies at the core of" *this* statute, which was not at issue in *Miselis*, is "speech integral to criminal conduct."

To the extent that Arthur claims that the *Brandenburg* test applies to all categories of unprotected speech, or at least to all "speech integral to criminal conduct," he is wrong. *See, e.g.*, *Rice*, 128 F.3d at 246 ("*Brandenburg*'s 'imminence' requirement" does not apply "to the punishment of speech that constitutes criminal aiding and abetting"). Arthur claims that "*Rice* drew the line for imposing liability at specific intent, not knowledge." *See* Br. 21. But the relevant *Rice* observation was far more limited: "[T]he First Amendment may *in some contexts* stand as a bar to the imposition of liability on the basis of mere foreseeability or knowledge that the information one imparts *could be* misused for an impermissible purpose." 128 F.3d at 247 (emphases added).

Arthur offers no reason to think the limited speech that Section 842(p)(2)(B) addresses is such a context, and, indeed, it is not. In

considering the potential need for a *mens rea* limit, *Rice* was focused on the "concern of those who publish, broadcast, or distribute to large, undifferentiated audiences." *Id.* Section 842(p)(2)(B) does not implicate that concern because, as discussed above, it requires particularized knowledge of a specific recipient's intent. Liability under the statute does not hinge on "mere[] . . . knowledge that the information one imparts *could be* misused for an impermissible purpose." *Id.* (emphasis added). Instead, Section 842(p)(2)(B) requires knowledge that a specific individual "*intends to* use" the information for an impermissible purpose. 18 U.S.C. § 842(p)(2)(B) (emphasis added). In other words, Section 842(p)(2)(B) captures speech that presents a specific danger— bombmaking instruction—and, even then, only when that danger is particularly acute—*i.e.*, when tied to knowledge that a specific recipient intends to use the information in furtherance of a federal crime of violence. The facts of this case, which go to the heart of the statute, show the grave risks such teaching poses and that it is "speech integral to criminal conduct" that can be constitutionally proscribed. *See*

*Stevens*, 559 U.S. at 468. This Court should affirm Arthur's conviction on Count 1.[10]

## II.   THERE WAS NO ERROR AT ARTHUR'S SENTENCING.

"In assessing whether a sentence is procedurally unreasonable because of a misapplication of the Guidelines, [this Court] review[s] the district court's legal conclusions de novo and factual findings for clear error." *United States v. Reed*, 75 F.4th 396, 404 (4th Cir. 2023). Here, the district court correctly applied U.S. Sentencing Guidelines § 3A1.4 in calculating Arthur's advisory guidelines range, based on the court's factual finding that Arthur's offense "involved, or was intended to promote, a federal crime of terrorism." Furthermore, even if the district court erred in applying the enhancement, any such error would have been harmless.

---

[10] Arthur briefly claims that, were this Court to vacate his conviction on Count One, it should also vacate his convictions for possession of illegal firearms. *See* Br. 23. Here, however, "any potential prejudice was mitigated by the strength of the Government's evidence on the remaining counts," *United States v. Barringer*, 25 F.4th 239, 249 (4th Cir. 2022). Arthur admitted both that he possessed the charged firearms and that they were unregistered. *See* J.A.573-584. In light of this overwhelming evidence, there can be no prejudice. *See United States v. Hardy*, 999 F.3d 250, 255 (4th Cir. 2021).

## A. The District Court Properly Applied U.S.S.G. § 3A1.4 in Calculating Arthur's Guidelines Range.

Section 3A1.4 instructs district courts to increase a defendant's offense level and criminal-history category "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. A "federal crime of terrorism" is defined by 18 U.S.C. § 2332b(g)(5) "to consist of two elements: (1) the commission of one of a list of specified felonies . . . and (2) a specific intent requirement, namely, that the underlying felony was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *United States v. Chandia*, 514 F.3d 365, 376-77 (4th Cir. 2008) (quoting 18 U.S.C. § 2332b(g)(5)); *see also* U.S.S.G. § 3A1.4 cmt. n.1 (instructing that "federal crime of terrorism" in the guideline has the meaning given the term in 18 U.S.C. § 2332b(g)(5)).

Arthur does not dispute (*see* Br. 27) that 18 U.S.C. § 1114 is an enumerated offense or that the district court properly concluded that his purpose (at least in part) "was to [a]ffect the conduct of Government by coercion and to retaliate against Government conduct," J.A.776.

34

Thus, all agree that the federal crime of violence that Arthur knew Buckshot intended to commit—the murder or attempted murder of federal law enforcement officers—qualifies as a federal crime of terrorism. But Arthur claims that the district court both erred in concluding that his offense "involved" this crime and failed to make the necessary finding that his offense "was intended to promote" the crime. He is wrong in both respects. This Court can affirm on either ground.

### 1. Arthur's crime involved a violation of Section 1114

The district court correctly found that Arthur's crime "involved" a federal crime of terrorism, namely the murder or attempted murder of a federal law enforcement officer in violation of 18 U.S.C. § 1114. Arthur challenges this conclusion by asserting: "Count 1 did not involve a crime of terrorism because it did not include a federal crime of terrorism. Rather, Count 1 included Mr. Arthur's mere *knowledge* that" Buckshot intended to commit such a crime. *See* Br. 26. This argument reflects an overly crabbed reading of the term "involved."

"The dictionary defines 'involve' as 'to have within or as part of itself.'" *See United States v. Kobito*, 994 F.3d 696, 702 (4th Cir. 2021). Thus, in determining whether a defendant's crime "involve[s]" a federal

35

crime of terrorism, a court considers both "the predicate offense and related conduct." *Id.* Here, Arthur's offense involved a federal crime of terrorism because he provided information integral to a violation of Section 1114. Indeed, the government had to prove, and did prove, a close link between the training that Arthur gave Buckshot and Buckshot's purported intent to murder federal officials. The statute requires such a nexus to "a Federal crime violence." And because the underlying crime of violence here was *also* a crime enumerated in 18 U.S.C. § 2332b(g)(5), the district court did not err in concluding that Arthur's crime "involved" or "ha[d] within or as part of itself" a federal crime of terrorism.

2. Arthur's crime was intended to promote a violation of Section 1114

Even if Arthur's offense did not "involve" a federal crime of terrorism, the district court correctly applied the Section 3A1.4 enhancement based on its finding that Arthur's offense was intended to promote such a crime. *See Kobito*, 994 F.3d at 702 ("[T]he use of the disjunctive means that 'the "intended to promote" prong must be applicable in some circumstances when the "involved" prong is not.'"

36

(quoting *United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010))). "An offense is 'intended to promote' a federal crime of terrorism 'whenever the defendant commits a felony with a goal or purpose to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B), even if the defendant has not necessarily completed, attempted, or conspired to commit the crime.'" *United States v. Hasson*, 26 F.4th 610, 624-25 (4th Cir. 2022) (quoting *Kobito*, 994 F.3d at 702); *see also Awan*, 607 F.3d at 315.

Arthur argues that the district court failed to make the findings required by the intended-to-promote prong of Section 3A1.4, but this claim ignores the district court's actual findings. The district court found that Arthur's offense was intended to promote a violation of Section 1114 by "encouraging and contributing to the murder of . . . federal law enforcement officers." J.A.776. The court did not rest this finding on the jury's verdict alone, as Arthur suggests. *See* Br. 27. Instead, the district court cited evidence that Arthur taught Buckshot "how to build a spiderweb to create a 'freaking death box' for ATF agents," tactics that Arthur described as "stupid lethal." J.A.776. And the court found that Arthur "reasonably foresaw the use of [those]

37

tactics to kill ATF agents." J.A.776; *cf. United States v. Graham*, 275 F.3d 490, 518-19 (6th Cir. 2001) (finding the defendant's 18 U.S.C. § 371 conspiracy was "intended to promote" a federal crime of terrorism where the targets of the latter crime "were reasonably foreseeable to the defendant"). Arthur does not challenge those factual findings on appeal, and they are sufficient to support the application of the terrorism enhancement.

The district court's analysis is consistent with this Court's precedent, contrary to Arthur's claim (at 27). In *Kobito*, the district court found that a defendant's possession of unregistered silencers was intended to promote the destruction of federal property—a crime listed in 18 U.S.C. § 2332b(g)(5). 994 F.3d at 703. In addition, the district court found the defendant had "an intent to influence or affect the conduct of the government"—satisfying Section 2332b(g)(5)'s specific intent requirement. *Id.* Based on those findings, this Court affirmed application of the terrorism enhancement. Similarly, in *Hasson*, the district court found that a defendant's firearms offenses (the crimes of conviction) "were designed to promote" attempts to kill or kidnap government officials (another enumerated felony), and it found the

38

defendant possessed the requisite intent under Section 2332b(g)(5). 26 F.4th at 625. This Court again affirmed application of the terrorism enhancement. *Id.* at 625-27.

The district court here made the same findings. It found that Arthur intended "to [a]ffect the conduct of Government by coercion and to retaliate against Government conduct," J.A.776, satisfying Section 2332b(g)(5)'s specific-intent requirement. And the district court found that Arthur's offense was intended to promote a federal crime of terrorism, namely a violation of Section 1114. When Arthur "encourag[ed] and contribut[ed] to the murder or attempted murder of" federal law enforcement officers, J.A.776, he was acting to "help bring into being" a violation of Section 1114, *Hasson*, 26 F.4th at 624-25. For the same reasons this Court affirmed application of Section 3A1.4 in *Kobito* and *Hasson*, it should also affirm the district court's advisory guidelines calculation here.

## B. Any Error in Applying U.S.S.G. § 3A1.4 Was Harmless.

Even if, as Arthur claims, the district court erred in concluding both that Arthur's conduct involved a violation of Section 1114 and that it was intended to promote a federal crime of terrorism, this Court

should still affirm Arthur's sentence because any such error would have been harmless.

"It is well established that [this Court] will not vacate a sentence if [it] determine[s] that the district court's improper calculation of the Guidelines advisory sentencing range was harmless." *United States v. Mills*, 917 F.3d 324, 330 (4th Cir. 2019). A guidelines error is harmless if the record shows that "(1) 'the district court would have reached the same result even if it had decided the Guidelines issue the other way,' and (2) 'the sentence would be reasonable even if the Guidelines issue had been decided in the defendant's favor.'" *Id.* at 330 (quoting *United States v. Gomez-Jimenez*, 750 F.3d 370, 382 (4th Cir. 2014)).

There can be no dispute that the first requirement is satisfied, as the district court was explicit that it would have "impose[d] the same sentence as an alternative variant sentence if [it] ha[d] in any way miscalculated the advisory guidelines range." J.A.799-800. Nor does Arthur anywhere claim his sentence was substantively unreasonable. Without such a claim, this Court should hold that any error in applying Section 3A1.4 to calculate Arthur's advisory guidelines range was harmless.

40

Arthur suggests (at 28) that application of Section 3A1.4 was not harmless because the advisory guidelines range without the enhancement would have been 168 to 210 months of imprisonment, compared to 1,140 months of imprisonment with the enhancement. But the district court varied downward more than 70 percent from the advisory guidelines sentence, sentencing Arthur to a total of 300 months of imprisonment. J.A.797 ("I don't think the advice of the guidelines is good advice, and I do think a downward variance is appropriate."). And the record reveals no abuse of discretion in the district court's conclusion that 300 months of imprisonment was the appropriate sentence regardless of whether the enhancement applied. *See, e.g.*, *United States v. Rivera-Santana*, 668 F.3d 95, 106 (4th Cir. 2012) (affirming variance of 90 months of imprisonment above the top end of the guidelines range); *United States v. McLaughlin*, No. 23-4493, 2024 WL 3690770, at *1 (4th Cir. Aug, 7, 2024) (alleged sentencing error harmless where the district court would have imposed the same sentence "regardless of whether it calculated the Guidelines as it did and varied downward, or arrived at the requested lower Guidelines range . . . and varied upward"). The district court acknowledged and

41

credited the mitigating evidence in the record, but it also found that "all of [Arthur's] offenses [were] very serious," that he "basically admitted to the crimes when [he] testified," and that he had not "express[ed] remorse." J.A.795-797. And the court determined that "teaching someone to kill an ATF agent is seriously wrong and worthy of just punishment." J.A.797. Balancing all those factors, the district court reasonably concluded that a 300-month sentence of imprisonment was "the sentence sufficient but not greater than necessary" to comply with the aims of sentencing under 18 U.S.C. § 3553(a). J.A.800; *cf. Mills*, 917 F.3d at 331. Because any error in applying was Section 3A1.4 in this case would have been harmless, this Court should affirm the sentence imposed by the district court.

42

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm Arthur's

conviction and sentence.

Respectfully submitted,

DANIEL P. BUBAR
Acting U.S. Attorney
for the Eastern District
of North Carolina

SUE J. BAI
Supervisory Official for the
National Security Division

DAVID A. BRAGDON
Assistant U.S. Attorney
150 Fayetteville St., Ste. 2100
Raleigh, NC 27601
Tel. (919) 856-4530

/s/ Joseph P. Minta
JOSEPH P. MINTA
GAVAN W. DUFFY GIDEON
Attorneys, Appellate Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel. 202-353-9055
joseph.minta@usdoj.gov

*Attorneys for the United States*

Dated: February 27, 2025

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the 13,000-word limit of Fed. R. App. 32(a)(7) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 8,071 words.

I further certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

<u>/s/ Joseph P. Minta</u>
Joseph P. Minta
Attorney for the United States

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of February 2025, a copy of the foregoing Brief for the United States was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Joseph P. Minta
Joseph P. Minta
Attorney for the United States

45