FILED: August 21, 2026

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 24-4306
(7:22-cr-00005-D-1)

---

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CHRISTOPHER CLARK ARTHUR

Defendant - Appellant

---

O R D E R

---

The Court denies the petition for rehearing en banc.

A requested poll of the Court failed to produce a majority of judges in regular active service and not disqualified who voted in favor of rehearing en banc. Chief Judge Diaz and Judges Wilkinson, Niemeyer, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens and Berner voted to deny rehearing en banc. Judges King, Gregory, and Benjamin voted to grant rehearing en banc. Judge Gregory wrote a dissenting statement.

Entered at the direction of Judge Agee.

For the Court

/s/ Nwamaka Anowi, Clerk

GREGORY, Circuit Judge, dissenting from denial of rehearing *en banc*:

I.

The true liberty at stake here, as in most challenges to overbroad speech restrictions, is what Justice Brennan called one of the "the cherished rights of mind and spirit." William J. Brennan, Jr., *The Supreme Court and the Meiklejohn Interpretation of the First Amendment*, 79 Harv. L. Rev. 1, 3 (1965). Expansive restrictions "[c]ut a great road through the law to get after" truly nefarious speech. Robert Bolt, *A Man for All Seasons* 40 (1960). If our essential protections are "cut . . . down," who "could stand upright in the winds that would blow then?" *Id.*

At its core, the challenged statute prohibits disseminating information "pertaining . . . in part" to explosives. 18 U.S.C. § 842(p)(2)(B). In a companion provision that is not challenged here, the Government adopted the tried-and-true method of tailoring such a broad speech restriction; it conditioned liability on the speaker's *intent* to facilitate criminal conduct. *See* 18 U.S.C. § 842(p)(2)(A). By contrast, the challenged statute permits the Government to penalize speech when the speaker, knows, *but does not intend*, that some listener plans to use the information "in furtherance of a Federal crime of violence." 18 U.SC. § 842(p)(2)(B).

The Supreme Court has already determined that a "knowledge" requirement insufficiently narrows a broad speech restriction. *See Reno v. ACLU*, 521 U.S. 844 (1997). If a speaker of innocuous topics and noble purpose has reason to fear the intent of one listener, the chilling effect on constitutionally protected speech is unavoidable. *Id.* at 880.

The body of First Amendment doctrine makes the same point: when considering the constitutionality of speech restrictions, "a strong intent requirement was, and remains," a key element to ensuring that efforts to criminalize speech do not stray too far into protected speech. *Counterman v. Colorado*, 600 U.S. 66, 81 (2023). By conditioning liability on mere knowledge of another person's criminal inclination, the Government has extended the reach of its criminal laws into the hallowed ground of the First Amendment.

I am troubled by this "criminal prohibition of alarming breadth" that defies First Amendment principles and doctrine. *United States v. Stevens*, 559 U.S. 460, 474 (2010). The continued existence of 18 U.S.C. § 842(p)(2)(B) creates an issue of exceptional importance that warrants the attention of the full court.

II.

This case comes before us on a facial challenge to 18 U.S.C. § 842(p)(2)(B). Defendant Christopher Clark Arthur does not challenge the statute as applied to his case, so I will not repeat the panel majority's recitation of the facts of his conviction. *See United States v. Arthur*, 160 F.4th 597, 602–03 (4th Cir. 2025).

A typical facial challenge would require establishing that "no set of circumstances" exists under which a statute is valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). But the Supreme Court has recognized a unique avenue for raising First Amendment concerns to a statute; the "overbreadth doctrine" requires a court to invalidate a statute "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State*

*Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). Because it invalidates a law that has some constitutional applications, "invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (cleaned up).

The overbreadth test arises out of the concern that overbroad laws "deter or 'chill' constitutionally protected speech." *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). When a statute prohibiting speech is overbroad, "[t]he assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). "For in such cases, the statutes lend themselves too readily to denial of those rights." *Id.* In part, the threat is that "the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). The greater concern, however, is the "prospect of chilling fully protected expression," considering the "ordinary citizen's predictable tendency to steer wide of the unlawful zone." *Counterman*, 600 U.S. at 77-78 (internal quotation marks omitted).

III.

"The first step in overbreadth analysis is to construe the challenged statute." *Williams*, 553 U.S. at 293. The statute reads:

> It shall be unlawful for any person . . . to teach or demonstrate to any person the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute to any person, by any means, information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, knowing that such person

> intends to use the teaching, demonstration, or information for, or in furtherance of, an activity that constitutes a Federal crime of violence.

18 U.S.C. 842(p)(2)(B). The statute restricts sharing a certain set of information, and it is therefore "presumptively invalid." *Stevens*, 559 U.S. at 468 (quoting *United States v. Playboy Entertainment Grp.*, 529 U.S. 803, 817 (2000)). The Government bears the burden to rebut that presumption. *Id.*

We can divide the statute into two key parts. First, the substantive prohibition clarifies what topics of speech might induce criminal liability. At its broadest point, the statute prohibits sharing "information pertaining to . . . in part, the manufacture or use of an explosive." 18 U.S.C. § 842(p)(2)(B). Second, the *mens rea* identifies the circumstances that trigger criminal liability. Here, speech is restricted if the speaker "knows" that a recipient "intends to use the . . . information for, or in furtherance of, . . . a Federal crime of violence." *Id.*

A.

I begin with the gallingly broad substantive prohibition in the challenged statute. Stripped of its accoutrements, the statute makes it a crime to "distribute . . . by any means, information pertaining to, . . . in part, the manufacture or use of an explosive." 18 U.S.C. § 842(p)(2)(B). Each element of the above sentence widens the scope of the statute, so I will address each in turn.

The term "explosive" is defined in the statute, and that definition does little to cabin the scope of the substantive prohibition on speech. 18 U.S.C. §§ 842(p)(1)(B), 844(j). The term "explosive" encompasses "any chemical compounds, mechanical mixture, or device

that contains any oxidizing and combustible units . . . in such proportions, quantities, or packing that ignition . . . [of] any part thereof may cause an explosion." 18 U.S.C. § 844(j). Plainly, the definition is not limited to weaponry—a firework, for instance, certainly qualifies as an "explosive." Nor is the text limited to devices designed to explode. The term covers anything "that contains combustible units" which "may cause an explosion." 18 U.S.C. § 844(j). That would seem to apply to a car, a computer, or perhaps a helium balloon. If these appear to be far-fetched examples, consider the fact that the statute has been held to apply to gasoline, even outside a pressurized container, *United States v. Lee*, 726 F.2d 128, 130–31 (4th Cir. 1984), as well as methane gas released into the air. *United States v. Hepp*, 656 F.2d 350, 352 (8th Cir. 1981). If the term "explosive" includes methane gas, it does little to restrict the scope of the speech prohibition in the challenged statute.

The rest of the challenged statute's text expands the speech restriction even further. The statute makes it a criminal offense to distribute information "pertaining to, in whole or in part" the manufacture or use of an explosive. 18 U.S.C. § 842(p)(2)(B). The word "pertaining" instructs only that the speech have some relationship to explosives. *See* Black's Law Dictionary, Pertain ("To relate directly to; to concern or have to do with."); Pertain, Oxford English Dictionary ("[B]e connected to (something)"). And the information need only pertain "*in part*" to the manufacture or use of explosives. 18 U.S.C. § 842(p)(2)(B). The list of entirely innocent topics that "pertain[] . . . in part" to the "manufacture or use" of methane gas is too lengthy to reproduce here, and it represents only a small subset of the speech prohibited by the challenged statute.

Accepting the text at face value, information prohibited by the statute includes basic chemistry, mathematics, and physics, which all "pertain[] . . . in part" to explosives. Nothing in the statute even requires a proximate link to the manufacture of explosives. "That store sells batteries" or "I expect gasoline prices to fall" bear a slight, yet concrete, relationship to potential explosive devices. Outlandish though these examples may appear, I struggle to see how they do not "pertain[] . . . in part" to the manufacture of explosives, and neither the Government nor the panel majority have suggested that the text of the statute is more limited than I describe.

If the statute contained no *mens rea* requirement, the analysis would end here, with the determination that 18 U.S.C. § 842(p)(2)(B) is blatantly unconstitutional. The shocking breadth of information criminalized by the statute would permit no other conclusion, especially since "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). The substantive prohibition has left the statute on precarious ground, and the *mens rea* must be an exacting one indeed to make up for the capacious speech restriction.

B.

The *mens rea* falls far short. In contravention of Supreme Court precedent, and in a first among the courts of appeals, the panel majority held that mere knowledge of another person's criminal intent is sufficient to remove First Amendment protection from otherwise protected speech.

The challenged statute provides that sharing prohibited information is only a

criminal offense when shared with "any person . . . knowing that such person intends to use the . . . information for . . . a Federal crime of violence." 18 U.S.C. § 842(p)(2)(B). In the Government's view, adopted by the panel majority, the "knowledge" requirement, coupled with a "specific person" requirement, sufficiently narrows the statute. *Arthur*, 160 F.4th at 613–14.

The Supreme Court already considered, and rejected, this argument in *Reno v. ACLU*, 521 U.S. 844 (1997). The statute in *Reno* made it a crime to communicate indecent material on the Internet to persons under 18 years old. *Reno*, 521 U.S. at 859. The Government presented the same argument in *Reno* as it did in *Arthur*—that the only liable speakers were those with *knowledge* that a particular recipient was under 18. *Id.* at 880 ("The Government also asserts that the 'knowledge' requirement . . . especially when coupled with the 'specific child' element . . . saves the CDA from overbreadth."). Per the Government's insistence, both in *Reno* and in *Arthur*, the speaker need only "refrain from disseminating such materials to persons they *know*" to be impermissible recipients. *Id.* (emphasis added).

The Supreme Court concluded that "[e]ven the strongest reading of the 'specific person' requirement . . . cannot save the statute." *Id*. Since the Internet is a forum that is "open to all comers," it will always be possible that someone under 18 received the prohibited materials, and that risk would dissuade adults from engaging in protected speech. *Id.* Even more insidious, the criminality of the speech hinged not upon the speaker's criminal motives, but the listener's identity. *See id.* Since the presence of a child

made the speech criminal, the statute "confer[red] broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child . . . [is] present." *Id.* Holding that the knowledge requirement is insufficient, the Supreme Court struck down the challenged statute.

I do not see why it should be any different here. It will always be possible that some listener has nefarious motives for seeking out information that "pertain[s] . . . in part" to explosives. 18 U.S.C. § 842(p)(2)(B). As the *Reno* Court noted, that possibility might dissuade a speaker from engaging in protected speech. Or, a speaker might be actively shut down by a person who claims, falsely or not, to have criminal intent. Any person can claim to be plotting a "Federal crime of violence" by way of an anonymous comment on the Internet or an unsigned note to a would-be author or teacher, and thus exercise a "heckler's veto" over the planned speech. When the underlying speech is otherwise protected, the Supreme Court has declined to permit vigilante censorship. That holding controls here.

The body of Supreme Court precedent only bolsters the point that a speaker must generally display criminal intent, beyond mere knowledge, in order to forfeit First Amendment protection. In *United States v. Hansen*, the Court evaluated the constitutionality of a law that made it a crime to "encourag[e] or induc[e]" illegal immigration. 599 U.S. at 770 (2023). The dissent, reading the provision broadly, would have struck down the statute. It explained that the language of the provision "seem[ed] to

encompass any and all speech that merely persuades, influences or inspires" unlawful entry into the United States. *Id.* at 794 (Jackson, J., dissenting). Under that interpretation, the Government conceded the statute would be unconstitutionally overbroad.

The majority opinion upheld the statute—but only after noting that "'encourage' and 'induce' . . . carry the usual attributes of solicitation and facilitation," including "the traditional *mens rea*." *Id.* at 780 (majority opinion). Since only speakers with "*intent* to bring about a particular unlawful act" could be prosecuted, the statute was not overbroad. *Id.* at 771 (emphasis added); *see also Williams*, 553 U.S. at 301 (statute is not overbroad because the speaker must believe, or intend the recipient believe, that the transmitted material is child pornography).

When punishing speech on the basis that it might spark criminal activity, the Supreme Court has "demanded a showing of intent" in order to "protect mere advocacy of force or lawbreaking from legal sanction." *Counterman*, 600 U.S. at 81 (2023). To ensure the Government could not withhold First Amendment protections from those engaging in protected advocacy, the Court has long insisted that tempestuous speech must be "'intended' (not just likely) to produce imminent disorder." *Id.* at 76. No opinion from any federal appellate court has permitted the state to prosecute a speaker who knew—but did not intend—that the speech would be used in furtherance of a listener's crime.[1] In

[1] The majority opinion points to a 1969 case from the Seventh Circuit that it believes permitted prosecution on the basis of the speaker's mere knowledge of a listener's criminal intent. *See Arthur*, 160 F.4th at 610 (citing *Nat'l Mobilization Committee to End War in Viet Nam v. Foran*, 411 F.2d 934 (7th Cir. 1969)). But in the Seventh Circuit's two-line analysis, it is not clear it reached that conclusion, since the indictment in that (continued)

reducing the *mens rea* required to forfeit First Amendment protection, *Arthur* stands alone.

We are left with a broad prohibition on speech, coupled with a reduced culpability standard. In an overbreadth challenge, that is a fatal combination. In *Hansen* and *Reno*, the Supreme Court has already indicated that a *mens rea* of specific intent is required for statutes like 18 U.S.C. § 842(p)(2)(B) to survive First Amendment challenge. On that basis alone, the panel majority should have found this statute to be overbroad.

C.

Principles of criminal law further emphasize that only specific intent—not mere knowledge—can tailor this statute to the requirements of the First Amendment. The panel majority equated the challenged statute to an aiding and abetting statute. *See Arthur*, 160 F.4th at 609. In criminal law, it is inadequate that the accessory defendant knew of the principal's criminal purposes. Aiding and abetting liability only attaches when the defendant acted with a purpose to assist the principal.

The Supreme Court has frequently asserted that aiding and abetting liability can only fall upon those with specific intent, i.e. purpose, to facilitate the commission of the offense. *See Borden v. United States*, 593 U.S. 420, 426 n.3 (2021); *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Only a person who "actively participates in a criminal scheme knowing its extent and character" can be charged with aiding and abetting liability. *Rosemond*, 572 U.S. at 77. The Supreme Court has never held that aiding and abetting

---

case (specified the defendants' specific intent, and the court's analysis determined only that "[t]he requirement of intent of course" sufficiently narrows the statute. *Foran*, 411 F.2d at 936–37.

liability can attach to "defendants who incidentally facilitate a criminal venture rather than actively participate in it." *Id.* at 77 n.8.

No less an authority than Judge Learned Hand has explained the importance of the heightened *mens rea* requirement for an aiding and abetting offense. Though there are "indeed instances . . . where the law imposes punishment merely because the accused did not forbear to do that from which the wrong was likely to follow . . . [,] in prosecutions for conspiracy or abetting, his attitude towards the forbidden undertaking must be more positive." *United States v. Falcone*, 109 F.2d 579, 580 (2d Cir. 1940). Judge Hand insisted that for aiding and abetting prosecutions, "[i]t is not enough that [the defendant] does not forego a normally lawful activity, of the fruits of which he knows that others will make an unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome." *Id.* In other words, for aiding and abetting liability to attach, the defendant must himself actively desire the success of the criminal venture.

Since the "opportunities of great oppression" are "very plain" in permitting mere knowledge to be a basis of aiding and abetting liability, "it is only by circumscribing the scope [of liability] that they can be avoided." *Id.*; *see also Borden*, 593 U.S. at 426 n.3 (citing *Falcone*). Judge Hand's concerns about a lesser *mens rea* for aiding and abetting liability ring with the same notes as the overbreadth doctrine. Aiding and abetting liability requires specific intent, not mere knowledge, so that courts can be sure that we are not punishing innocent persons that happen to find themselves adjacent to criminal conduct.

For reasons unexplained, the panel majority rejected the concerns of the Supreme

Court and of Judge Hand, finding the distinction between knowledge and intent irrelevant "for the purposes of the First Amendment." *Arthur*, 160 F.4th at 609. First, it concedes that "the statute's prohibitions are . . . akin to . . . aiding and abetting of criminal conduct." *Id.* (internal quotation marks omitted). It then admits that the "*only real difference* between aiding and abetting, on the one hand, and the conduct proscribed by § 842(p)(2)(B), on the other, is that the former requires the abettor to share the same criminal intent as the principal perpetrator." *Id.* But it dismisses this as a "distinction without a difference" because "practically speaking," a person who violates the challenged statute "is aiding—i.e., facilitating—the underlying crime." *Id.* The panel majority writes directly contrary to the settled principle that aiding and abetting requires a heightened *mens rea.*

But the First Amendment insists upon more protection, not less. It insists on a proper *mens rea* to "reduc[e] the honest speaker's fear that he may accidentally or erroneously incur liability." *Counterman*, 600 U.S. at 75 (cleaned up). Though a heightened *mens rea* "will shield some otherwise proscribable . . . speech because the state cannot prove what the defendant thought," *id.*, the First Amendment "reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *Stevens*, 559 U.S. at 470. The panel majority takes it upon itself to reconsider that judgment by granting the Government unprecedented flexibility to prosecute speakers who do not intend to facilitate a crime.

D.

One additional flaw in the structure of the challenged statute is that it restricts

transmission of information that is already public and readily available. The criminal act is "teach[ing] or demonstrat[ing]" prohibited *information*. 18 U.S.C. § 842(p)(2)(B). That should immediately raise red flags, given "the essential role that the free flow of information plays in a democratic society." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996). Factual information is, "after all, the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011).

The First Amendment emphasizes protection for factual information, particularly when that factual information has been lawfully obtained. This is the rule articulated in *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) and *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979). In each of these cases, state laws prohibited newspapers from publishing the names of a juvenile party to a crime. *Florida Star*, 491 U.S. at 526; *Daily Mail*, 443 U.S. at 98. The Court explained in *Daily Mail*, and reaffirmed in *Florida Star*, that a newspaper which "lawfully obtains truthful information about a matter of public significance" should not be punished for publication of that information, "absent a need to further a state interest of the highest order." *Florida Star*, 491 U.S. at 533 (quoting *Daily Mail*, 443 U.S. at 103). Because the information was readily accessible, the Court concluded that the ban on newspaper publication was not in service of such a compelling interest. *See Florida Star*, 491 U.S. at 541; *id.* at 535 ("[I]t is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities.").

The Government has acknowledged that "anyone interested in manufacturing a bomb, dangerous weapon, or a weapon of mass destruction can easily obtain detailed instructions from readily accessible sources." United States Dep't of Justice, *Report on the Availability of Bombmaking Information, the Extent to Which Its Dissemination Is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution* 1 (1997). The Internet and the so-called "underground press" provide much of this information, but so do reference works "intended for military training, agricultural and engineering use." *Id.* at 5. Applied to this case, the *Florida Star* principle militates in favor of striking down the statute for overbreadth. Even if the text of the statute only prohibited sharing information about building bombs—which it does not, *see supra* at 4–6—it would still encompass information that is easily accessible by lawful, public means.

The result is, in addition to the basic physics, chemistry, and mathematics which the statute criminalizes, even the bombmaking information is publicly available—and for good reason. Legitimate uses of explosive devices abound, from construction and demolition, to clearing agricultural land, to commercial fireworks. It is important to note that the challenged statute does not eliminate information from the public record. It imposes burdens on the individual who wishes to share public knowledge.

*Florida Star* and *Daily Mail* articulate the First Amendment concerns with restrictions on sharing publicly available information. Not only is it "relatively unlikely to advance the interests" of the Government to restrict sharing information already in the

public domain, but it enforces "timidity and self-censorship" upon those who share truthful information. *Florida Star*, 491 U.S. at 535. These concerns lie "in addition to, of course, the overarching public interest, secured by the Constitution, in the dissemination of truth." *Id.* at 533 (internal citation omitted). When any member of the public can access information, the First Amendment rarely countenances inflicting punishment on those who share it.

E.

A sister provision ensures that 18 U.S.C. § 842(p)(2)(B) has few, if any, constitutional applications. The challenged provision, 18 U.S.C. § 842(p)(2)(B), was enacted alongside an unchallenged provision: 18 U.S.C. § 842(p)(2)(A) ("Section A"). Section A encompasses the entire "plainly legitimate sweep" of the challenged statute, but without the constitutional infirmity. *Williams*, 553 U.S. at 292. Therefore, there is no legitimate purpose of the statute that outweighs its constitutional defects.

As discussed above, 18 U.S.C. § 842(p)(2)(B) makes it a criminal offense to provide any part of a broad spectrum of information "to any person, . . . knowing that such person intends to use" the information in furtherance of a Federal crime of violence. 18 U.S.C. § 842(p)(2)(B). Section A omits the "specific person" requirement and substitutes "intent" for "knowledge." 18 U.S.C. § 842(p)(2)(A). The difference between the two statutes can be represented as follows, with Section A in bold:

> It shall be unlawful for any person—
>
> to teach or demonstrate ~~to any person~~ the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute to any

> person, by any means, information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, ~~knowing~~ **with the intent** that ~~such person intends to use~~ the teaching, demonstration, or information **be used** for, or in furtherance of, an activity that constitutes a Federal crime of violence.

18 U.S.C. §§ 842(p)(2)(B), 842(p)(2)(A). Section A suffers from none of the constitutional issues of the challenged statute, as it is well established that speech is not protected when the purpose of the speech is to incite criminal activity. *See Williams*, 553 U.S. at 298 ("Many long established proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech . . . that is intended to induce or commence illegal activities.").

Reading the two provisions in tandem, the challenged statute *only* applies where the speaker *did not intend* the speech to be used in furtherance of a Federal crime of violence. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed . . . so that no part will be inoperative or superfluous, void or insignificant."). We need not wonder whether "less restrictive alternatives would be at least as effective in achieving the legitimate purpose" of the statute. *Reno*, 521 U.S. at 874. In fact, all of the challenged statute's constitutional applications survive under Section A.

By removing all of the constitutionally palatable applications from the purview of the challenged statute, Section A ensures that there is no counterweight to the constitutionality of the challenged statute. The challenged statute is relevant only for those defendants who do not intend that the listener commit a Federal crime of violence. For the reasons I have articulated above, that means the statute's entire scope is constitutionally infirm, and it is not rescued by any "plainly legitimate sweep." *Williams*, 553 U.S. at 292.

IV.

As described above, when confronted with a shockingly broad statute and an inadequate *mens rea*, the First Amendment mandates striking it down for overbreadth. The panel majority and the Government bypass this analysis. Instead, in a display of constitutional acrobatics, they assert that the First Amendment does not extend to the speech covered by the statute. They claim that any speech punished or chilled constitutes "speech integral to criminal conduct," which has historically received no First Amendment protection. *Arthur*, 159 F.4th at 607.

But the panel majority and the Government mischaracterize the "speech integral to criminal conduct" category. This "well-defined and narrowly limited" category of unprotected speech traditionally applies to speech that cannot be separated from the commission of a crime, not speech that merely has the potential to assist another person's criminal act. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). The panel majority improperly broadens this category, at the expense of socially valuable and constitutionally protected speech.

A.

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). But the Supreme Court has explained that the First Amendment has "permitted restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Chaplinsky*, 315 U.S.

at 572). These "well-defined and narrowly limited classes," *Chaplinsky*, 315 U.S. at 571–72, include "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Stevens*, 559 U.S. at 468 (internal citations omitted).

Before the district court, the Government argued that 18 U.S.C. § 842(p)(2)(B) is a constitutional criminalization of incitement. *See* J.A. 129 (claiming that the statute prohibits only "speech that incites imminent lawless action"). Changing tack on appeal, the Government insisted to this Court that the challenged statute is a better fit for the category of "speech integral to criminal conduct." Response Br. at 18. The panel majority agreed with the new classification and held that the prohibited speech receives no First Amendment protection because it is "integral to criminal conduct." *See Arthur*, 160 F.4th at 608.

The "speech integral to criminal conduct" category originated in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). In *Giboney*, a union representing door-to-door ice salesmen tried to strong-arm ice distributors into exclusively dealing with union salesmen. *Id.* at 492. Empire Storage and Ice Company, the lone holdout, continued to provide ice to nonunion sellers. *Id.* To pressure Empire to enter an exclusivity agreement, the union picketed the company, and Empire responded by seeking an injunction against the union under state law prohibiting anticompetitive agreements. *Id.* The union members appealed the injunction, claiming that it inhibited their First Amendment right to picket. *Id.* at 493.

The Court upheld the injunction. *Id.* at 498. Though the First Amendment does protect the right to picket, the Court explained constitutional protections for speech do not

extend immunity to "speech or writing used as an integral part of a valid criminal statute." *Id.* A criminal act remains a criminal act, and it does not receive additional protection when the act takes the form of speech. *Id.* at 502. Therefore, even though the union acted here "through speaking and writing," the First Amendment does not provide a special exemption for criminal conduct "merely because the conduct was in part initiated, evidenced, or carried out by means of language." *Id.*; *see Brown v. Hartlage*, 456 U.S. 4, 55 (1982) ("The fact that "an agreement to engage in illegal conduct" takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech.").

Few cases have given significant attention to this category of unprotected speech, but it is typically invoked to justify the constitutionality of prohibiting crimes that are carried out by way of speech. The crime of solicitation, for instance, has a communicative element, but the speech is part and parcel of criminal behavior. *See Hansen*, 599 U.S. at 783. Perjury is inseparable from speech, *cf. United States v. Alvarez*, 567 U.S. 709, 720–21 (2012), and conspiracy and extortion are likewise rooted in speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (listing examples of speech-based crimes that are integral to criminal conduct). Speech is "integral to" these crimes because speech is a mechanism for carrying out criminal acts. The "unquestioned" constitutionality of these criminal laws is not inhibited by the coincidence that the criminal act takes the form of speech. *See United States v. Dunnigan*, 507 U.S. 87, 97 (1993).

In short, speech is "integral to criminal conduct" when it is "the very vehicle of the

crime itself." *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970); *see Speiser*, 357 U.S. at 535–36 (Douglas, J., concurring) ("[W]hat one thinks or believes, what one utters and says have the full protection of the First Amendment. It is only his actions that government may examine and penalize."). In *Giboney*, a violation of the state's restraint-of-trade law did not receive special constitutional protection merely because it took the form of picketing. 336 U.S. at 498. Speech that is itself tantamount to a criminal act does not receive First Amendment protection.

The Court's careful delineation of this category is evident in its approach to solicitation laws. Offering to distribute contraband is criminal solicitation, but only when the contraband is actually illegal to possess. The Court has insisted that when the Government prohibits offers to distribute a class of material, the entire class must be illegal to possess—otherwise, the offer is protected speech. For example, in *New York v. Ferber*, the Court upheld a prohibition on advertising or selling child pornography. 458 U.S. 747 (1982). The Court determined that child pornography was a "definable class of material" for which "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any." *Id.* at 763–64. Advertising and selling the material had no value except as an "economic motive for . . . the production of such materials," and thus was permissibly restricted. The Court crystallized the analysis in *United States v. Williams*, explaining that "offers to give or receive what it is unlawful to possess"—again, child pornography—"have no social value and thus . . . enjoy no First Amendment protection." 553 U.S. at 298; *see Hansen*, 599 U.S. at 783 (citing *Williams* as providing an example of speech

integral to criminal conduct). When the entire category of underlying material is illegal, efforts to distribute or sell it are "proposal[s] to engage in illegal activity" and therefore rightfully proscribed. *Williams*, 553 U.S. at 298.

But when a class of material is not entirely unlawful, laws punishing distribution of that material are overbroad. In fact, child pornography is a "special case" of material that is entirely illegal to produce or possess. *Stevens*, 559 U.S. at 471; *id.* at 472 ("Our decisions in *Ferber* and other cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment."). While the Court has permitted prohibitions on offers to sell child pornography, it struck down prohibitions on offers to sell videos that "appear[] to be" child pornography, on the grounds that computer-generated child pornography retains First Amendment protection. *See Ashcroft*, 535 U.S. at 241, 249–50. Similarly, material that "depict[s] animal cruelty" is lawful to possess; in *United States v. Stevens*, the Court struck down a federal law prohibiting the sale of such material. *Id.* at 464, 472. The painstaking analysis of each class of materials reflects the Court's commitment to punishing speech that is only itself a criminal act.

The unprotected category of speech identified in *Giboney* has never encompassed speech that is merely helpful to facilitating a crime. It reaches only the speech that is itself criminal conduct. *See Williams*, 553 U.S. at 298 (analogizing the prohibited speech to "offers to sell illegal drugs"). As the Supreme Court has insisted, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft*, 535

U.S. at 253; *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 701 (Kennedy, J., concurring) ("Inconvenience does not absolve the government of its obligation to tolerate speech.").

B.

The panel majority pursues a flawed analysis of this narrow exception to First Amendment protection. Instead of identifying the thrust of this "narrow" and "historical" category of unprotected speech, the panel majority turns to authority that has minimal value in interpreting judicial opinions: the dictionary. *See Arthur*, 160 F.4th at 168. The panel opinion cites two dictionaries to suggest that speech is "integral" to criminal conduct so long as it contributes to criminal conduct. *Id.* It goes on to suggest that when a listener uses information to perpetrate a crime, the information is necessarily "integral" to the crime because the crime could not have been committed "but for" the information. *Id.*

It is common wisdom that "[t]he language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *see* Shyamkrishna Balganesh, *Relying on Restatements*, 122 Colum. L. Rev. 2119, 2124 (2022) (explaining that judicial reasoning emerges "contextually from the circumstances of the dispute," and therefore cautioning against "parsing and dissecting the language of judicial opinions in ways commonly done for statutes."). No less a textualist than Justice Scalia explained that it is "generally undesirable . . . to dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's*

*Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). This distinction is the natural consequence of the fact that "the words of [judicial opinions], as opposed to their dispositions, have, strictly speaking, no legally binding effect." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 42 (2012). Use of the dictionary is frowned upon as a tool of precedential analysis, and it is no replacement for reasoned consideration of controlling dispositions.

Doctrinal analysis of "speech integral to criminal conduct" reveals no support for the expansion the panel majority effects. It is evident that speech here is not the "vehicle" of criminal conduct as it was in *Giboney* and its progeny, since the criminal act is some other person's intended Federal crime of violence. *See Arthur*, 160 F.4th at 608–09. The challenged statute is closer to those at issue in *Ashcroft* and *Stevens*—it can be connected to criminal conduct, but it is not itself part and parcel of criminal conduct.

The panel majority does not grapple with this conceptual distinction. Instead, it asserts that "but for the proscribed communications, the other person would lack the means to commit their intended crimes." *Arthur*, 160 F.4th at 608. Even that is incorrect. As discussed above, even if the text of the statute was focused solely on dangerous bombmaking information, that information is freely available from legitimate sources that the challenged statute does not purport to touch. *See supra* at 14. If the speech prohibited here is "integral" to criminal conduct, it is integral in an entirely new manner.

The theoretical flaw with the panel majority's analysis accompanies a practical flaw: all the examples it identifies of "speech integral to criminal conduct" require the speaker

to have criminal purpose. *See Arthur*, 160 F.4th at 608 (listing conspiracy, solicitation, perjury, extortion, and aiding and abetting). Each of the crimes that the panel majority identifies as members of the category "require[s] that the defendant specifically intend that a particular act be carried out." *Hansen*, 599 U.S. at 778 (solicitation and aiding and abetting); *Williams*, 553 U.S. at 298 (conspiracy); Model Penal Code §§ 223.4 (extortion), 241.1 (perjury). The panel majority offers no explanation about why that is the case. Nor does it justify expanding the "historic and traditional" category to include the challenged statute and its reduced *mens rea*. I have already discussed at length the myriad issues with the challenged statute's reduced *mens rea* requirement. *See supra* at 6–17. Suffice it to say here that those issues, particularly the Supreme Court's holding in *Reno*, remain fatal to the panel majority's analysis.

In fact, the panel majority turns *Giboney* on its head. As the *Giboney* Court explained, speech integral to a crime does not receive any more protection than conduct integral to a crime. 336 U.S. at 691. Under the new law of the Fourth Circuit, speech receives even less protection than conduct. A speaker prosecuted under 18 U.S.C. § 842(p)(2)(B) need only have knowledge of a listener's criminal intent—but a person cannot be prosecuted under federal aiding-and-abetting law without a specific intent that matches the principal actor's. *Compare Arthur*, 160 F.4th at 609, *with Rosemond*, 572 U.S. at 71. I agree that sometimes speech should be treated on par with conduct, but I cannot accept that it should ever be treated worse.

C.

One final, powerful indication that the prohibited speech is not "integral to criminal conduct" is that the prohibited speech has tangible social value. The Supreme Court has "often described those historically unprotected categories of speech as being of such slight social value . . . that any benefit that may be derived from them is clearly outweighed by the social interest in their proscription." *Counterman*, 600 U.S. at 73–74 (quoting *Stevens*, 559 U.S. at 470) (cleaned up). Of course, courts are not the arbiters of social value, and the Supreme Court has cautioned against a First Amendment balancing test in which courts determine whether speech has sufficient worth. *Stevens*, 559 U.S. at 471. But the categories of unprotected speech derive, in part, from an understanding that some speech is "no essential part of any exposition of ideas." *Chaplinsky*, 315 U.S. at 572; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (explaining that false and defamatory statements of fact have "no constitutional value"); *Ferber*, 458 U.S. at 762 ("The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*."). A court rarely, if ever, withholds First Amendment protection from speech that has even slight social value.

The social value of this speech is apparent. For one, the prohibition in the text encompasses a wide range of information. As discussed above, foundational principles of mathematics, physics, and chemistry fall under the umbrella of 18 U.S.C. § 842(p)(2)(B), as information "pertaining . . . in part" to the "use of explosives." 18 U.S.C. § 842(p)(2)(B). There is no question about the social value of that information. And the Government has acknowledged that even the most dangerous information covered by the

statute has important social uses. *See* United States Dep't of Justice, *Report on the Availability of Bombmaking Information, the Extent to Which Its Dissemination Is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the United States Constitution* 5 (1997) (describing "military training, agricultural and engineering" uses of bombmaking information).

The information does not forfeit its social value whenever some listener bears criminal intent. Even if a speaker is aware that a recipient of the information intends to commit a crime, a speaker might have her own valuable reasons for transmitting the information. *See* Kent Greenawalt, *Speech, Crime and the Uses of Language* 86-87 (1989) ("A speaker may conceivably think a communication has significant value for the listener beyond the listener's immediate purpose."). While courts have rightly concluded that communications made with criminal intent have no value, that logic does not apply neatly to communications received with criminal intent.

Consider a physics class. If one of thirty students in a physics lecture intends to put that knowledge towards nefarious purposes, why should that reduce the value to the other twenty-nine students? They might apply that same information in furtherance of any number of beneficial goals, and even if they do not, the First Amendment recognizes the inherent value in sharing knowledge. I fail to see how the social value of a physics lecture changes if the lecturer learns of one student's brewing misdeeds.

The key issue with the challenged statute is that the propriety of speech fluctuates

based on the intent of the recipient. A speaker with her own, legitimate purpose might be communicating factual information to an audience with a diverse range of purposes, but 18 U.S.C. § 842(p)(2)(B) would allow one listener to tarnish the interaction. The statute threatens the rights of the speaker, of course, but also of the rest of the potential audience that is robbed of the opportunity to receive information. *See Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). In total, the statute "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another." *Reno*, 521 U.S. at 874.

V.

The right to free speech is a "fundamental and highly prized" right, that "need[s] breathing space to survive." *Gibson v. Fla. Legislative Investigation Committee*, 372 U.S. 539, 544 (1963) (citing *N.A.A.C.P v. Button*, 371 U.S. 415, 433 (1963)). The challenged statute stifles speech in an unprecedented manner. Its broad text, combined with a reduced *mens rea* requirement, grants frightening discretion to the Government to suppress protected speech made for innocuous purposes. The Supreme Court has made clear, time and again, that the potential danger of speech freely shared is insufficient justification "to abrogate the fundamental law embodied in the First Amendment." *New York Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring).

The light of free expression and truth is dimmed beneath the shadow of this statute's suppression. Out of fealty to the First Amendment, I would grant rehearing en banc.